Good morning. May it please the Court, Jonathan Libby appearing on behalf of Appellant Isidro Morin Hernandez. Your Honors, despite agreeing not to seek, argue, or even suggest in any way that the Court impose a sentence other than what had been stipulated to in the plea agreement, the government breached the plea agreement by highlighting and providing disparaging commentary regarding Mr. Morin's criminal and immigration history. Was any objection made at the time? There was not. So we're on a plain air review. We are on plain air review, Your Honor. What difference did it make? Well, of course, it made a difference in terms of the sentence he received. Under the bond and plea agreement, he was facing a 12-month sentence. The Court rejected the plea agreement, ended up imposing a high-end guideline sentence of 30 months. So he received a sentence two and a half times. It doesn't tell us it made a difference, though, because the district judge seemed to have a pretty firm idea of what it was going to do. And how do we have any reason to think that what the government said had anything to do with the result? Well, there are a number of things we know. First, we know that there was very little in the pre-sentence report that was unknown to the judge at the time the plea agreement and the plea was entered. Doesn't that work against you? I don't believe so, Your Honor. I mean, the Court indicated that it needed to review the pre-sentence report to determine whether or not to accept the plea agreement. But having read the pre-sentence report, the only additional information the judge received was that he had a 10-year-old misdemeanor conviction for which he received probation. That was the only new information the Court had, other than, of course, the sentencing position that the government had filed less than a week before that, in which it argued that Mr. Marin was a danger to the community. Counsel, as I understand it, this is an 11C1 plea agreement. The parties have stipulated to a sentence. The sentence they stipulated to was the 12 months you mentioned, plus three years of supervised release. Correct. The three years of supervised release is a disfavored supervised release in the case of someone like Mr. Marin. Consequently, the burden of proof is on, well, the parties, but in effect the government, to justify a disfavored condition. The ---- I mean, Your Honor, I would respectfully disagree. I mean ---- You don't think so? No. You don't think there was any burden in this case to justify the three years, given that the Court ultimately determined not to do it?  The Court ultimately determined not to do it. The parties had already outlined everything they needed to do in the plea agreement. All the information the Court needed in order to determine whether or not to accept the plea agreement was already presented to it. The Court didn't need either party to submit any additional information. Well, obviously. Isn't it obvious that the Court needed something more than what was in the plea agreement in order to impose the three years of supervised release? Because what was in the plea agreement, and as a practical matter, what the government argued, was not sufficient to persuade the Court to impose the three years of supervised release. Well, the Court did impose three years of supervised release in addition to a 30-month sentence. So the Court in fact ---- Are you certain of that? That's my review of the record, yes, Your Honor. And what we do know ---- What do we make of the fact that the district court does not refer to the sentencing memorandum in its sentencing discussion? Does that work for or against you? I think it's a wash, Your Honor. I don't know that it means very much of anything. The Court made very little reference to anything in the record. It did refer to the PSR. It did make a reference to the PSR at the time it rejected the plea agreement. It made a reference to the PSR. It said that's what it wanted to look at. That's correct, that it needed to ---- Well, at the time of the change of plea, it indicated that it couldn't commit to accepting the binding plea, that it needed to then look at the PSR. At the time it rejected the plea agreement, all it said, all the Court said was, having reviewed Mr. Murren's history, I now find I'm going to reject the plea agreement. It gave no further explanation. So we don't know if it was reviewing the history from the PSR. We don't know if it was basing it primarily on the sentencing position that it had received just days before in which it included this disparaging commentary. And what we do know from what this Court has said, and I'll quote from Mondragon, when a prosecutor's comments do not provide the district judge with any new information or correct any factual inaccuracies, the comments could have been made for only one purpose, to influence the district judge to impose a harsher sentence. That's what this Court has said in Mondragon. It reaffirmed that in Whitney. And that's what happened here. The government didn't provide anything new. Even if we accept that, though, I still haven't heard anything that tells me that had any real impact on the sentence. I should note, for example, that there was no supervised release imposed here. You've got lots of cases. These didn't come up. But there was none here. So the judge, he's not following along with what he's told. Why should we believe he followed along with whatever the government recommended or may have inferred from the government's comments, even though the government's busy recommending something else? I just don't see a connection. Well, because what else did the Court have to work with? Well, the Court knew the guy had already served time and was doing it again. That's right. But the Court already knew that at the time of the – that it took the plea. And it could have at that time simply said, I reject the plea agreement. Based on this record as I know it today, I can't accept it. Well, it then later rejected the plea agreement based on nothing new other than this 10-year-old – What's inconsistent with that? Well, because I would suggest – When did the judge ever say, this is a great deal, I'm ready to sign it? No. But the Court said it would need to review his record. Well, he didn't review anything more than this 10-year-old misdemeanor and the government's comments. Well, it sounds to me like a polite way of saying, I'm not crazy about this deal. I'm going to need to take another look. But I still don't see what it – how – where a different result is ever reached. Well, Your Honor, when we look at what Puckett has said – You don't want us to send it back to the same judge, do you? No, Your Honor. Because you expect it's going to be the same sentence. Well, under – Because he had his own reasons for giving that sentence. Well, if the government breached the plea agreement, this Court's precedents require that it be sent back to a different judge. Okay. Can I – I'm looking at ER 27. And the – Judge Wilson is saying, upon release from imprisonment, the defendant shall be – and then he says, I'm not going to impose supervised release because he'll be deported. I thought you said he did get supervised release. I apologize, Your Honor. I was confusing it with another case. And the justification for the sentence is the history of prior deportations, including a conviction in which he did receive a 14-month sentence, which evidently had no deterrent effect, as the pre-sentence report shows. So he did refer to the PSO. Absolutely. And the whole point here is what this Court's precedents have said. You have suggested that he – we don't know what he looked at. He did look at it. And he doesn't cite the sentencing memorandum, and he doesn't cite danger to the community, and he doesn't – he didn't impose supervised release. All absolutely true, Your Honor. But, again, what this Court has said is – what we're looking at is what the government did. And what we're looking at is whether there's plain error. And whether there's prejudice under Gonzales-Aguilar. Well, Gonzales-Aguilar – and I refer the Court to the letter brief that we submitted in which we give great detail how this case is very different from Gonzales-Aguilar. You know, what – what Whitney said was – I'm sorry, what Puckett said, what the Supreme Court said in Puckett was the defendant will not always be able to show prejudice either because he obtained the sentence that was supposed to be recommended or he likely would not have obtained the benefit in any event. And Gonzales-Aguilar essentially isn't dealing with that. In that case, it said the defendant there likely would not have received the – would have not accept – had the plea agreement accepted because of his very extensive criminal history. The fact that the government sentencing position was filed more than a month before the decision was made. All of these factors are not what we have here. Here we have a sentencing position called – Well, the first factor is exactly what you have here. Judge Wilson refers to the fact that he's already served 14 months. It didn't deter him. So why would he give a sentence lower than that? The court was already aware of that. And that's another fact that that was discussed in Gonzales-Aguilar, that there was all of this new information, all right, and this extensive criminal history. That's not what we have here. What we have here is a relatively insignificant criminal history as criminal histories go. We're talking about – Counsel, you threw me off when you said that you were convinced that in fact the judge had imposed the three-year supervised release because that wasn't in my memory and I wanted to check the record. But assuming for the moment that the court did not impose that, in fact followed the disfavoring of that condition for men and women likely to be deported, set out in the guidelines. Assuming that, how can we say that the government was not obligated to make some argument supportive of the three-year supervised release if in fact the government felt, and apparently the defendant did not dispute, that that was a reasonable imposition? Your Honor, because the parties had already agreed to that as part of the plea agreement and the court was aware of it. The parties had agreed to it, but the judge hadn't. But the court was aware of that agreement at the time that the plea was accepted. Well, the judge was aware that the parties had stipulated to it and that the guidelines disfavor it. What was there in the record that the government could have referred to to support the three years of supervised release without violating the rule, I suppose, that you want us to suggest, strict liability, any comment unfavorable to the defendant by the prosecution vacates the sentence? Your Honor, I'm not asking the court to adopt any new rule. I'm asking the court to simply apply established precedence of this court. Whitney ---- You don't see any tension between Whitney and the more recent cases? No, Your Honor. Whitney is a very recent case. I mean, Gonzales ---- Granted, but there are a couple that are more recent. There are, Your Honor, but again, don't conflict with Whitney. Well, what about the implication in Judge Reinhart's decision where he seems to say that in order for plain error analysis, in order to show that a comment by the government didn't influence the statement, you have to show that it's almost beyond reasonable doubt that the trial court would have thrown it out, whereas the more recent cases seem to shift and say the burden is on Mr. Moran to show that by more than speculation, the trial court clearly would not have imposed the sentence it did if the government had just shut up and said everything we have, Your Honor, is in the record. No. The issue is whether the government's position may have influenced the court in such a way that it could have impacted and likely impacted the court's decision. And the difference is may have, probably did, probably didn't. Well, sure. And obviously, you know, we can't know absolutely what the Court was thinking, which is why you look to what the Supreme Court said in Puckett. Clearly, the Supreme Court said plain error applies and prejudice can be shown under certain circumstances. Is not presumed. Prejudice is not presumed when plain error applies. That's right. Sure. But what the Court said was, you know, the defendant, if there's a situation where he likely would not have obtained the benefit in any event, that's the, that's really, that's what the Supreme Court said you look at. Why shouldn't we look at the context of this case and what the trial court did and see that the statements that you oppose or object to were all made in support of granting the three years of supervised release. The trial court must have considered that and rejected it and went with the, with the advice and the timelines. Why can't, why shouldn't we say it's clear that those remarks had no influence on the trial? Well, for one, because the Court imposed a 30-month sentence instead of a 12-month sentence. So the Court may have, because let's, let's, let's be very clear here. The sentence includes both a term of imprisonment and a term of supervised release. That's all part of the sentence. They're not separate. They're part of the sentence. Well, they were treated separately. Well, the government conveniently included arguments by separating them on the two factors in its position. But they're not separate. And so what the Court did here was. They were separate in the mind of the trial judge. He imposed the sentence of imprisonment and didn't impose the sentence of supervised release. Well, correct. And the Court may have decided that it was better to impose 30 months and no supervision as opposed to 12 months and three-year supervision. You know, you can't separate them out. It's all part of the sentence. And the Court decided it was going to impose 30 months' imprisonment and then said, well, and so I'm not going to impose supervision in addition to that. But the Court rejected the 12-month sentence that had been called upon. And let's be clear. As to whether or not the government breached, the issue is whether or not it should have or could have was permitted to submit anything to the Court. This Court has said the only thing the government can do is correct inaccuracies in the record. That's not what the government did here. The government included language that was disparaging to Mr. Marin, which this Court has said in Mondragon and Whitney and other cases it cannot do. You're over time, but I just want to bring back to what the Court actually said. He doesn't. What you're objecting to is the inflammatory language in the discussion of why supervised release should be imposed. The Court, I've read you most of what he said, but at the end he says he has been deported and illegally returned a number of times. That is reflected in paragraphs 10 and 11 and 12 of the pre-sentence report. And so the sentence is necessary to deter him from future illegal conduct of this kind and to provide adequate punishment for his crime. There's nothing in that that suggests that he's a danger to the community. So assuming that the government breached, you still have to get over the prejudice prong of plain air. And this ties in with your articulation argument that the judge didn't explain. Looking at this language, how can we conclude that the district court didn't make its own independent judgment? Well, I think we have to assume that the Court reviewed the government's sentencing position. So the government's sentencing position was before the Court. There's no evidence in this articulation that the judge, that that influenced the judge's decision. Which is why we have to look at all of the factors together and see what happened here. And again, and this is when you go through the analysis from Gonzales-Aguilar, where all of the factors it looked at, which were, you know, whether or not the PSR, whether the government's position of the PSR were different, the length of time. You're relying on what you told us in the rebuttal. Correct.  Thank you. Thank you. Thank you. We'll hear from the government. Good morning. May it please the Court. Christina Shea for the United States. In this case, the parties entered into a binding plea agreement and agreed to recommend a sentence. The sentence had two parts. One was a 12-year term of imprisonment. And the second part of the sentence was a three-year term. Twelve months? Twelve months. Twelve-month term of imprisonment. You guys are having a little trouble with what went on in this case. And a three-year term of supervised release. The government filed a seven-page sentencing position in which it recommended the custodial term, the 12-month term, no fewer than six times. In addition, it's a recommended statement of sentence where a district court judge may often read. In imposing the sentence, it also included the 12-month term of imprisonment. Why did the government have to file a sentencing memorandum at all? What was the point? As in ER-48, under the plea agreement, the parties are required to recommend a sentence. Yes. And so the government files a sentencing position in order to recommend the sentence to the district court by applying the 3553A factors, by explaining to the district court why the sentence is justified. And the sentence is justified because the parties agreed to it, but also because to support the district court's independent analysis. For example, if the government had not included a summary of criminal history, the argument at this point could be the recommended sentence doesn't take into account his criminal history. And so maybe the district court should be going higher than 12 months. The criminal history was not set forth in the PSR? It was, Your Honor. Yeah. It already was. It absolutely was. But the government's recommendation. But what got added was that his criminal history includes a conviction for drug-related crime involving a large quantity of cocaine and betrays a troubling disregard for the criminal and immigration laws of the United States. Absolutely, Your Honor. And that is to justify the second part of the sentence, the three-year term of supervised release, which is also something that the government was obligated to recommend, which is disfavored in the guidelines. And as this Court noted, the district court did not actually even impose. How did the government's memo speak to the ground upon which it's disfavored in the guidelines by saying he's got this serious history? It's disfavored in the guidelines because of the likelihood of deportation. Yes, Your Honor. It's disfavored in the guidelines under 5D1.1C. And then in order to justify the term of supervised release despite the fact that it is deportable, the defendant was a deportable alien, the guidelines say to apply the factors of 5D1.3B. And those factors are the nature and circumstances of the offense, the history and characteristics of the defendant. They also include the need for deterrence and the danger to the community. And it's after the government recognizes, first of all, in a separate section discussing supervised release, after the government recognizes that supervised release is disfavored, after the government lays out those factors, it then has that single sentence applying those factors. So the government's position is that you negotiate a binding plea agreement where the defendant agrees to an unusual term of supervised release. And what the government then in its benign effort to justify this good deal for the government needs to use highly charged language that says this guy's really a danger to the community and has a great disregard. And so that's carrying out a very favorable plea agreement to the government where they get three years of supervised release where they wouldn't normally, the guidelines wouldn't favor it. So the lesson to the defense bar is what? Your Honor, I don't. No good deed goes unpunished? Your Honor, the government would contest that this is a government favorable plea agreement. There is a four-level reduction under the fast-track disposition. This is a negotiated plea agreement that defendants take often and often do not take. I'm looking at the supervised release. Yes, Your Honor. You agreed, the government agreed to that level of incarceration, okay? Yes. And then you go on and you get something in addition, which is supervised release, which the guidelines under these circumstances would disfavor. And in order to push that side of the agreement, you load it up with all of this language, even though the defendant has already stipulated to it. Your Honor, supervised release and custody to the government serve different purposes. I understand it. But in terms of what it opens up apparently in the government's mind is this is a chance to go load up the sentencing memorandum with some very prejudicial information about the defendant, which, of course, wouldn't have any impact on the judge's evaluation of the reasonableness of the incarceration portion. It would not. Your Honor, that is not the purpose of why it is that the government seeks a three-year term of supervised release. You're missing my point. You're using the supervised release as a way to get in highly prejudicial language that obviously is going to impact the judge's evaluation of the reasonableness of the time of incarceration. If this guy is so bad that he needs three years of supervised release, even though he's going to be departed, then that probably ought to raise some questions about whether the agreed-upon term of imprisonment is really reasonable, which is the most important part of the plea agreement. Two answers, Your Honor. One is that I'm not sure that that is the most important part of the agreement, because after the plea agreement is rejected, defendant files another sentencing the defendant files a sentencing position in which he argues for a 12-month term of imprisonment and no supervised release. And so that indicates that the defendant believes that the three-year term of supervised release is actually important. You're missing my point. Your Honor. The facts line up to support the argument that was made. Now, I'll accept the proposition that it wasn't the government's intent. It was approaching this mechanically and trying to justify supervised release. But from a judge's perspective, expecting the defendant to be deported and knowing the guidelines to suggest not supervised release, I've got somebody with this real horrible history. How am I going to take the government relating that history? Is it going to impact me as to whether or not I'm going to give three years of supervised release? Or isn't it at least as likely and probably more likely to influence me to say, well, this is a bad guy. I shouldn't let him out of prison after 12 months. I should give him a stronger sentence. And I have to say, I mean, I'm not a sentencing judge at all often, but I kind of scratched my head at this deal. If you've got somebody who's previously served 14 months for the same crime, what exactly is the deterrent effect of giving a new sentence of less than that? So it doesn't surprise me that a judge scratches his head in reaction. And that's what we went through with your colleague with regard to the prejudice. But it sure seems to me that for the government to say anything, well, you can justify it as being in support of supervised release, but its impact on the potential incarceration term seems pretty obvious, doesn't it? And as a result, I'd suggest the government needs to be pretty careful in those sentencing memorandums. If they're going to offer what struck me as a pretty lowball deal and they want the judge to do it, you've got to be careful about saying bad things about the defendant and try to justify the supervised release. Yes. And also, Judge Fischer, to more directly answer your question and also I believe what Judge Clifton is getting to, is discussing, the government doesn't believe that the supervised release tail is wagging the dog of custodial, the custodial sentence. That wasn't my point. You're using it as a reason to get in, a justification for getting in what you wouldn't do with regard to the imprisonment. But, Your Honor, the government does need to justify the three-year term of supervised release, and that's evident in this case where the judge does not even impose the three-year term of supervised release, even after the government justifies it. So how does saying bad things about him really do it if the expectation is going to be deported? Well, Your Honor, under the guidelines, in order for the district court to impose the term of supervised release for a deportable alien, it has to find these factors. And the government's sentence in that section applies those factors, and that's simply what it does. In addition, there's the law is not that there can't be any, that the government has to remain silent. The law is that the sentence or the disparaging comment that defendant identifies, quote, serves no other purpose. And in this case, there clearly is another purpose, which is to argue for the three-year term of supervised release. And also, in addition, any sort of prejudice would be purely speculative at that point when we're discussing whether or not it's possible that the judge was influenced by some sort of bleed over from one to another. The judge clearly in this case was not influenced by the parts of the record that Judge Fisher has identified. Thank you. Thank you. We thank both counsel for your argument. The case just argued is submitted. The next case on the calendar is United States v. Rousey. Or however it's pronounced, and I'm happy that defense counsel will let us know. Good morning, Your Honor. Alisa Solano-Peterson for Defendant Jean Marie Rousey. Your Honor, this Court requested that the parties be ready to discuss the case of United States v. Moschella, which involves the breach of plea agreement.  I will therefore first discuss that case, and there are two different aspects about Moschella, and I will discuss each of those separately. In Moschella, the government was obligated to recommend a low-end guideline sentence, and it did recommend such sentence. Moschella is distinguishable from this case because in this case, the government implicitly recommended a higher sentence, which is something that did not occur in Moschella. This case is much more analogous to the Whitney case. In the Whitney case, the Court found that there were two breaches. The first breach regarding information obtained by the defendant during his cooperation does not apply in this case, but the second breach does apply, which is that the government breached its agreement by implicitly arguing for a sentence greater than the low-end guideline sentence that it had promised it would recommend. And although the prosecutor uttered the requisite words by recommending a sentence at the low-end of the guidelines, the additional statements constituted an argument for a higher sentence. Your client reserved the right to argue for a lower sentence, correct? Well, yes, that was the second aspect, Moschella. I was getting to it. I just first wanted to bring to the Court's attention how similar this case is to the Whitney case. In the Whitney case, the government referred at least twice to the statement to the co-conspirator's sentence of 120 months. And the Court did not need that information because the Court did not ask the government for that information. That information was provided in the sentencing papers. But the Court did not need that information because the Court did not ask the government for that information.  And I think that's something that we've been saying in papers. Indeed, in our Court, if it hasn't been said in the brief, we don't want to hear that argument. So the fact that the Court might have received the information doesn't tell us that there's not reason to urge the Court to focus on that information or be aware of the information. Right. But it was in the context where the Court was saying it was concerned about variance, you know, in terms of the various sentences. And then there was absolutely no reason for the government to again mention that, and again in referring to the much higher sentence that Mr. House did. Well, when you were in court, did you say anything that already or I don't know if you represented a trial. When your client's counsel was in court, was anything said that repeated what had previously been said in written submissions? That was said in submissions? In a sentencing memorandum or anything else? Was everything said in court by your client's counsel new to the Court, something previously unknown to the Court? Was everything said, was everything that was said unknown to the Court? I didn't understand. Well, I'm caught in pronouns. To begin with, were you trial counsel for your client? No. Okay. Your client's lawyer made a presentation to the Court. Is that correct? Did that oral presentation contain entirely new information, or did it refer to things that the Court was previously, had previously received in writing or some other submission? Probably repeated things that were in writing. So why is it wrong for the government to repeat something in writing that's previously been submitted in writing? Because it was more than that. Okay. Here the Court was basically arguing, the Court was really concerned about the disparity in the sentence between Halstead and the defendant. And so it was in the context of the Court being concerned about the disparity in the sentence. And it was also said twice. And a prosecutor has to be especially careful when you have a plea agreement and you're supposed to recommend a certain sentence. A prosecutor really has to be careful about what they say that they don't breach that agreement. So it's a little bit of a different issue. And here it was in the context of saying that there was a disparity between Mr. Halstead's sentence and Rozzi's sentence. And it was mentioned twice. And on top of that, the government said that the 70 months is the minimum sentence the defendant should receive. So in the Moschella case you can see that. Well, isn't the reference to minimum a response to Ms. Rozzi's argument? Quite proper, because she reserved the right to do that. But isn't that responsive to her contention? Well, the government is recommending a 70-month sentence. I am permitted to argue for a lesser sentence, and I'm arguing for a 33-month sentence. I think I should get a 33-month sentence. And in response to that, the government says, no, the minimum she should get is the 70-month sentence that we are recommending. What else could the government say that wouldn't offend your position in order to justify 70 months versus 33? The government could have done what the court did, I mean, what the government did in Moschella, which is to say the sentence should be the recommended sentence. Here, the government went beyond that. It didn't say the sentence should be 70 months, and there's no reason why the government shouldn't have said in response the sentence should be 70 months. Instead, the government said that was the minimum, which implies that the sentence should be higher than that. It would be appropriate for the sentence to be higher than the 70 months. So it was implicitly arguing for a higher sentence. And also, there is a provision in this plea agreement, but it's different than the one in Moschella, because in this plea agreement, both parties reserve the right to argue for a sentence outside the sentencing range established by the sentencing guidelines. This provision is ambiguous, because basically it deprives the defendant of the benefit of her bargain. Because if this provision is construed in a certain way, it means that the government could say, yes, we recommend a 70-month sentence, but we also recommend a 120-month non-guideline sentence at the same time. And that would nullify the defendant's benefit of the bargain. The reason why defendants give up their valuable rights and enter into a plea agreement is that they are expecting that the prosecutor will recommend a lower sentence. But if the prosecutor is free to recommend even a higher sentence beyond the guidelines, that completely nullifies the bargain. Counsel, isn't, in order to fall within this Court's precedent, finding a breach of the plea agreement that is not expressed and implicit, doesn't this Court have to leave your argument with the feeling that the prosecutor recommended 70 months, but with a wink and a nod, and was in effect telling the judge, look, we really think you ought to give more, but, you know, we bound ourselves and we're going to stay with it. And unless we can find the wink and the nod in something that was said or done, don't we have to find that there's no plain error? No, I would disagree with that, because there are cases that say that even if there's a mistake that's made, it's inadvertent. It doesn't mean that there's not a breach of plea agreement. It doesn't mean that there shouldn't be specific performance, because this kind of thing affects the defendant's substantial rights. If the Court is influenced by the prosecutor even inadvertently mentioning a piece of information and the defendant receives a higher sentence, that does affect the defendant's substantial rights. So there are cases that say, I believe, Santabello and other cases that say it doesn't matter whether it was inadvertent. And in this case, there was an objection to what the government's comments. And the defendant's attorney at the very end said that he objects to the 70 months being the minimum sentence because that's a breach of the plea agreement. And it's the defendant's position that basically he was objecting and saying that there was a breach of the plea agreement. Now, there were a few additional comments that were made that the defendant's attorney did not refer to, but it's the defendant's position that that's basically all part of it. He objected in saying that there was a breach of the agreement. And how did the trial court respond to the objection? The trial court, you know, at the point, the trial court did not respond to that. So the trial court did not, you know, make a finding as saying at that point, as I recall, or no, I'm sorry. I'm getting a little confused. I believe, I'm not sure at which point, but when the prosecutor said that he had recommended, you know, the 70-month sentence, that was the sentence that he had recommended. Could you address the issue you raised about the mental health condition and supervised release? What's your concern there? My concern is that it is overbroad. I mean, there's two concerns. One is that it's really not necessary because she's had a history of seeking her own treatment. But the other is that the condition is overbroad because it could include, because it's overbroad, it could include hospitalization. Where do you get that? It said the defendant shall participate in mental health treatment, which may include evaluation and counseling, until discharged from the treatment by the treatment provider with the approval of the probation officer. So where do you get that the court is contemplating hospitalization? Well, it doesn't exclude it. I mean, it doesn't say it's only limited to counseling. So it's only because it could be overbroad. I mean, if the court construes it as not including hospitalization. Has the government urged that it includes inpatient treatment? No. If there were an order for, let's suppose a probation officer in response to a psychiatrist or a psychologist or whatever, recommended that your client be put into inpatient hospitalization, would she be without any remedy? Well, that's the question. I mean, it appears that might be a possibility. Where does it give? I don't see any authorization in there for hospitalization because it only talks about the probation officer, for example, having authority to discharge her. But there's no language of commitment there. I'm familiar with medication cases, for example, and we have, and others where there's a liberty interest at stake and we construe them narrowly. But so I'm just trying to find out what your concern is in this language that would imply that without any authorization from the district court that it could be inpatient treatment. Well, it just basically says since. I read it. The defendant shall participate in mental health treatment, which may include evaluation and counseling, until discharged from the treatment by the treatment provider with the approval of the probation officer. Well, it says it may include, you know, counseling, but it doesn't exclude anything else. So my question is does it also include something more? Counsel, Ms. Rousey has in the past, in fact, I think continuing up until the time of sentencing, had consulted mental health practitioners and received counseling from them. There's nothing in the record to suggest, however, that she's ever been committed, that she has any major psychosis or anything that would justify involuntary commitment. Is there? No. It's just that because there's a certain amount of coercion when something is a supervised release condition, and so they're saying that, you know, if she needs to seek this kind of treatment and the provider says she needs to be hospitalized, is that, you know, will they have to go through a whole other thing? Or is it or will she be forced to accept whatever treatment there is because it's a supervised release condition? That's my only question. If the Court believes it's narrowly tailored and it doesn't state that. Did you find any? Now, clearly, some men and women without past serious mental health problems faced with incarceration may be temporarily suicidal. But did you find any case law that would permit a probation officer to authorize the commitment of a supervisee without a hearing? No, I have not, Your Honor. And if in the context of supervised release the question of committing somebody because they were suicidal came up, wouldn't that person be entitled to the same protections that anyone would if a physician thought she was, you know, at immediate risk? I would certainly hope that she would be. And you didn't find any case law to the contrary, did you? No, I did not find any case law that said the probation officer has the power to do that. Okay. And I also wanted to talk about the insufficient factual basis argument. Well, you've exceeded your time, so. Can I ask one question? I'd like to reserve a little time to. May I ask one question before she sits down? Sure. One of the issues in this case is the amount of restitution that was specified. It's my understanding from the record, and correct me if I'm in error, that part of the way that Ms. Rousey showed that she was rehabilitated and showed that she was entitled to a fair sentence was that she turned over a lot of her assets. And, in fact, pursued a former person that she was in a relationship with to cough up assets allegedly traceable to this activity. Is there anything in the record to show that Ms. Rousey has assets available to pay the amount of the restitution order? I don't. There's nothing in the record that shows that at this time she could pay that large amount of restitution, no. All right. Or any approximation of it. There's nothing in the record that would show that she could pay anything, you know, reaching millions of dollars. Yeah. And is it – I notice some of the men and women who claim they were defrauded by the operation that Ms. Rousey was part of said she had offshore bank accounts and everything. There's no evidence of that in the record, is there? No, there's not. Thank you. Thank you, Your Honors. Thank you. I can reserve a little bit of time. You have no time to reserve. Okay. Good morning. May it please the Court. Greg Staples for the United States. I don't believe I have anything to add that's not already in my brief. All right. May I ask a question, then? The last question I put to counsel for Ms. Rousey had to do with the restitution. Now, the restitution amount set was very large. And there is evidence in the record that Ms. Rousey surrendered significant assets in the lead-up to her sentencing in this case. Apparently, she was initially charged and a significant amount of time went by in that she and one other co-defendant cooperated with men and women allegedly harmed by this operation to try to get their money back. My question to you is, is there any evidence in the record that would support an inference that Ms. Rousey could pay the restitution that was ordered? Or any significant approximation thereof? No. What there is in the record, and I believe this would be found mostly in her sentencing position, was a description of how she had pretty much been reduced to destitution. So what do you do in a case like this where unquestionably a man or woman participated in theft of millions but are in fact destitute? How do you handle restitution, in your opinion? The best you can hope for is a modest wage garnishment if she were to come out of prison and get a job. Now, she's been disbarred. She's a long in years. And she's going to serve a significant period of time. If I sense where you're going, the reality is no one's going to get any money back. You stated that she had given significant assets back. I did address this during the sentencing hearing to state that I believe that was worthless. What it consisted of was mostly shares in what were shell companies. The people that she was doing business with were very good at setting up fictitious entities through which they would cycle money. What she turned over was essentially shares in these worthless companies. And I believe it's in the sentencing transcript that one of the lawyers with whom she was working with stated essentially no, we've not gotten very much back, including from her former partner. But they did indicate that she tried to help them. Once the barn door was open and the horses were out, yes, she tried to help. But it was far too little, far too late. And the government does not have any information, does it, that Ms. Rousey, in fact, has extensive offshore accounts? We traced the lead that we were given concerning money that was perhaps possibly in Brazil, and there was nothing there. Can I ask you to comment on the government's view of Condition 5 of the supervised release, the mental health? Is there any ambiguity in there that needs narrowing down with respect to institutionalization? I do not believe it's ambiguous. I do not read it as empowering the probation officer on her own to institutionalize a defendant. Well, you say on her own. It does say that the probation officer has to approve discharge, and discharge does connote in some respect some form of hospitalization. You are discharged from a hospital. So aside from that language, that does imply that somebody might have put her into a hospital, and the discharge therefrom would have to come from the probation officer. That is a possible reading. I do not read it that way. I would understand discharge will also include discharge from a mental health treatment program or counseling. Yes, I understand it can, but I was saying the one verb there has that connotation. It could go the other direction. It could be discharge from a program, but it could be discharge from a hospital. The government doesn't take that position. But when you say that the probation officer couldn't do it on her or his own, who else would be involved in the decision? The court. Not just the physician. In my experience, and I have no cases to cite for this, but in my experience, if a probation officer was to decide that a probationer needed to be institutionalized against her will, in my experience they will file something with the court to bring it to the court's attention and have the court order it. That was my understanding. And just to go back to the earlier question concerning restitution, perhaps the futility of it, I would like to point out that there is a benefit to the victims for having the restitution order entered with them listed as victims for tax purposes. It often comes up that they are then able to declare a loss on their taxes, even though they don't get the money back. So I did not want to leave the impression that we are engaging in otherwise futile activity by getting these very large restitution orders against defendants who really don't have much of a chance to pay them back. Thank you very much. Thank you. We thank both counsel for the argument. The case just argued is submitted.
judges: Singleton, Fisher, Clifton